HARRISON, Judge Pro Tem.
The defendant, Jason Edward Mason, Jr., was convicted of second degree murder in the drive-by shooting death of a 16-year-old girl. He was sentenced to the mandatory term of life imprisonment without the benefit of parole, probation or suspension of sentence. He appeals, asserting four assignments of error. We affirm the defendant’s conviction and sentence.
FACTS
At about 4:30 p.m. on November 27, 2007, the victim, Latora Wiley, was walking with a large group of teenagers on Ledbetter Street in Shreveport.[1] Some members of the group were walking on the sidewalk, others in the street. A white Equinox SUV drove down the street, and a confrontation ensued. Several teens yelled at the vehicle occupants that the SUV had almost struck some of them. The SUV left the area, and the teens continued on to a local park. After staying theré for about 10 minutes, the group left the park and began walking on Led-better Street again. At this time, the SUV returned. Charles Evans, the passenger in the SUV, fired shots which killed the victim and wounded a teenage boy. The vehicle fled; however, several of the teens saw it in the park a few minutes later.
The police quickly developed the 25-year-old Evans as a suspect. When the police went to his house, his teenage sister informed them that he had admitted to her that he shot two people. When he returned home, Evans was taken into custody. He gave a statement, after which he was booked into the jail.
It was also discovered that the driver of the SUV was the defendant, Evans’ 41-year-old uncle, and that the vehicle belonged to him and his wife. The police asked the defendant to come to the station and give a statement that evening. He complied. After he gave his statement, the police reinterviewed Evans, who gave a statement implicating his uncle.[2] On November 30, 2007, the defendant was interviewed again. Subsequently, he was arrested as a principal in the shooting death of the victim.
In January 2008, the defendant testified before a grand jury, which indicted him for second degree murder in the victim’s death. Following a jury trial, he was convicted as charged in August 2011. Evans invoked his right against self-incrimination and did not testify at his uncle’s trial.
A sentencing hearing was held in September 2011. The defendant’s verbal motion for new trial was denied, and the trial court imposed the mandatory sentence of life imprisonment without benefits. The trial court also denied the defendant’s oral motion to reconsider sentence.
In January 2012, the defendant filed a motion for new trial in which he alleged the procurement of new evidence, i.e., a statement from his nephew exonerating *433 him. A hearing was held in April 2012. Evans, who entered a guilty plea to manslaughter and attempted murder after the defendant’s trial, testified that his uncle did not know that he was going to shoot, did not directly give him the gun back or encourage him to shoot. The trial court denied the motion on the grounds that it was untimely and that none of the evidence presented was new evidence.
The defendant now appeals his conviction and sentence, asserting four assignments of error.
SUFFICIENCY OF EVIDENCE

Law

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Goss, 46,193 (La.App.2d Cir.5/18/11), 70 So.3d 6.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
In relevant part, La R.S. 14:30.1 states: A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... assault by drive-by shooting ..., even though he has no intent to kill or to inflict great bodily harm.
A “drive-by shooting” means the discharge of a firearm from a motor vehicle on a public street or highway with the *434 intent to either kill, cause harm to, or frighten another person. La. R.S. 14:B7.1(C).
A defendant who is a principal in a drive-by shooting can be convicted of second degree felony murder even though the fatal shot was fired by a companion acting in concert with the defendant in the commission of the shooting. State v. Stewart, 43,149 (La.App.2d Cir.5/7/08), 982 So.2d 353, writ denied, 2008-1343 (La.3/6/09), 3 So.3d 480; State v. Brooks, 45,778 (La.App.2d Cir.3/2/11), 58 So.3d 506, writ denied, 2011-0631 (La.10/7/11), 71 So.3d 309.
Regarding the law of principals, La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Only those persons who knowingly participate in the planning or execution of a crime are principals. Mere presence at the scene is therefore not enough to “concern” an individual in the crime. Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Pierre, 631 So.2d 427 (La.1994). All persons concerned in the commission of an offense, either directly or indirectly, are principals in the crime and culpable according to the mental state they possess at the time of the offense. It is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention. State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223; State v. Hampton, 46,363 (La.App.2d Cir.5/18/11), 69 So.3d 614, writ denied, 2011-1467 (La.2/3/12), 79 So.3d 1024.
Under the doctrine of transferred intent, when a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or infliction of great bodily harm would have been unlawful against the intended victim, then it would be unlawful against the person actually shot even though that person was not the intended victim. State v. Brooks, 42,226 (La.App. 2d Cir.8/15/07), 962 So.2d 1220. A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime are equally culpable. A principal may be connected to those crimes for which he has the requisite mental state. State v. Brooks, supra.

Evidence

The state presented the testimony of four of the teenagers who witnessed the shooting. They included the sister and stepsister of the victim and Terrance Washington, the young man who was wounded. While there were numerous discrepancies between their various accounts of the shooting, they all generally agreed that the defendant’s vehicle almost struck members of their group who were walking in the street. Several indicated that the vehicle “swerved” at or “veered” toward them. When the teens reacted by yelling at the vehicle as it passed, it stopped and backed up. The witnesses agreed that words were exchanged between the vehicle occupants and the teenagers, after which the vehicle drove off. There was disagreement among the witnesses as to who spoke to the occupants, what was said, and the manner in which *435 the words were spoken. In their testimony, only one of the teen witnesses admitted that profanity was used. However, the detective who took their statements shortly after the shooting said most of the kids indicated that there was profanity. Although Terrance stated in his testimony that he did not argue with the SUV passenger and that he did not recall telling the police that he exchanged profanities with the SUV passenger, the detective who took his statement at the hospital testified that Terrance told him that he had gotten into an argument with the SUV passenger. Also, two of the other teen witnesses testified that Terrance yelled at the SUV occupants about almost hitting them.
All of the teen witnesses agreed that their group stayed at the park for about 10 minutes. They then began walking down Ledbetter Street again. The white Equinox returned, came to a complete stop, and the passenger began to shoot. Three of the four teen witnesses testified that there were four to five shots fired. The vehicle then “crept off’ slowly. It did not speed off, but drove away “like nothing ever happened.”
The state also introduced the two statements the defendant made to the police, as well as his grand jury testimony. In his first statement, which was given the night of the shooting, the defendant recounted picking up his nephew at about 4:30 p.m. They came upon kids in the street screaming and yelling. He said that his nephew was almost hit by a young man and that he backed up to talk to the young man, who was saying to Evans “you got a gun, you want to use it, go ahead on.” According to the first portion of the defendant’s statement, someone shot at them as they were leaving and Evans fired back. The defendant said he did not know where Evans got the gun because he had taken it from him the day before. The defendant said that he screamed and yelled at Evans af-terwards, but that he did not know anyone had been shot.
In the same statement, the defendant then indicated that there were actually two confrontations. After the first one, he took Evans home. However, he decided that they needed to go back to talk to the guys. When he drove up, the young people began walking toward the vehicle. He was letting his -window down when shots were fired and then Evans fired. He said he shook Evans after he fired the shots and that he was upset. He took Evans home. As to the gun, he said he had taken it away from Evans due to his temper. However, when he picked him up from work that day, he told Evans, “your gun is right here ... just go on and take it.”
In his second statement which was given on November 30, 2007, the defendant said that he gave Evans the gun at the store they went to after the initial confrontation. The defendant again said he was the one who wanted to go back to “get it straight with these guys.” As they were leaving the store, he told Evans his gun was right there and to take it because the defendant’s wife did not want it in the car. He told Evans they were going to go straight to Evans’ house because he feared retaliation. However, when they turned around to go back, there were guys on his side of the vehicle. When he went to roll down his window to talk to them, he heard shots and “took off.” The defendant said he drove off because he panicked and he didn’t know who was shooting. He did not recall saying anything to Evans after the shooting.
In this second statement, the defendant stated that he wanted Evans to “be a man, to go back and take care of the situation.” By that, he said he meant to be man enough to apologize. He wanted to go back to apologize himself so Evans *436 would be man enough to apologize. He insisted that they did not go back with the intention to “do anything” and that he gave the gun back to Evans to put it up. He also stated that he never thought Evans would do what he did. He maintained that he did not tell Evans to use the gun and that he wanted to show Evans how to resolve conflict without violence.
In his grand jury testimony, the defendant gave a more detailed account of the events. He stated that since Evans did not have a driver’s license, he would give him a ride home from his job at the airport. He testified that on the day of the offense, he picked up Evans and was driving him home when they came upon a big crowd of kids in the street. The defendant estimated that the group consisted of approximately 20 to 25 teens between the ages of 14 to 18. He had to stop because they would not move. He put his window down. One young man was “acting up,” jumping up and down, flashing what he believed were gang signs. The young man accused the defendant of almost hitting his cousin. Evans lowered his window to talk to the cousin. The young man on the defendant’s side of the car looked at Evans and said, “Hey, man, if you have a gun, use it.” Evans told the young man, “Ya’ll were in the middle of the street.” The young man called Evans “a little bitch ass n — -r.”
According to the defendant’s grand jury testimony, the road cleared and he drove off. He took Evans to get cigarettes at a corner store. He decided that they should go back and apologize because he feared some sort of retaliation against Evans, who lived in the area. When he drove up to the group, he was rolling to a stop when he heard two shots coming from his right. He did not completely stop. After the shooting, he drove Evans home but did not say anything to him other than they would talk later. When Evans called him from the police station that night and a detective asked him to come in, the defendant did not drive the SUV used in the shooting to the station.
In his grand jury testimony, the defendant said he took the gun from Evans the day before the shooting due to the young man’s “bad temper.” Evans told him that the gun was jamming; the defendant said later in his testimony that he was going to have the gun looked at but decided he needed to get the gun out of the vehicle before his wife saw it. The defendant testified that he told Evans to put the gun in the car console.[3] He denied telling Evans to get his gun and put it up because his wife wanted it out of the car or saying that he wanted Evans to take his own responsibility. He testified that he did not discuss the gun with Evans, much less give it back. He then said that they did discuss the gun at the airport when he picked Evans up and that this was the only discussion they had about the gun. The defendant testified that he told Evans the gun was still in the console and to make sure he got it before he got out of the vehicle. According to the defendant, Evans knew where the gun was because it was still where Evans placed it the day before. He conceded that he did not call the police after the shooting; he said his cell phone was dead. However, he further admitted that he did not call 911 when he got home.
While Evans invoked his Fifth Amendment rights and declined to testify at the defendant’s trial, the defense introduced a *437 January 2008 letter written by Evans in which he stated that his uncle did not know he was going to shoot because he did not know himself that he was going to fire the gun. However, the state then presented as impeachment evidence the two statements Evans gave to the police in which he indicated that the defendant gave him the gun or access to it.

Discussion

After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty of second degree murder. In order to convict him of second degree murder, the jury had to conclude that the defendant acted as a principal to Evans either when he acted with the specific intent to kill or inflict great bodily harm, or when Evans committed a drive-by shooting.
The teen witnesses to the shooting gave generally consistent accounts of the shooting wherein there was an initial confrontation with the SUV occupants which was followed by a second encounter only 10 minutes later when the SUV returned. During the subsequent incident, the SUV came to a complete stop, and the passenger opened fire. One of the two persons shot just happened to be the young man who previously exchanged words with the passenger. The SUV then drove off slowly. This testimony depicts a deliberate and retaliatory shooting by the SUV occupants.
In contrast, the defendant asserted that he never completely stopped the SUV and “took off’ after the shooting because he panicked. He initially claimed that someone in the group of teenagers fired at the SUV and that his nephew fired back in response. He then contended that he did not realize where the shots came from before finally admitting that his nephew, who was seated next to him, fired them. The defendant gave several inconsistent statements as to how Evans came back into possession of the gun, which the defendant admitted “taking away” from him the day before due to his “bad temper.” Furthermore, by his own admission, the defendant fled the scene, did not stop to render aid to the wounded, and never called the police to report the shooting. See State v. Meyers, 95-750, 96-35, 96-395 (La.App. 5th Cir.11/26/96), 683 So.2d 1378, writs denied, 97-0015 (La.5/9/97), 693 So.2d 766, 98-2530 (La.2/5/99), 737 So.2d 745, 2000-0995 (La.12/8/00), 775 So.2d 1079. In the defendant’s versions of the offense, he sought out the teens who were involved in the prior incident as part of a noble — but failed — lesson in conflict resolution, and it was merely a tragic coincidence that Evans regained access to the gun in close proximity to the time of the shooting and that one of the two people shot was the young man who angered Evans.
Faced with these two wildly divergent accounts of the fatal shooting, the jury was required to make credibility determinations. It obviously resolved them against the defendant, whose three accounts of the incident contained numerous inconsistencies. Such credibility evaluations are within the province of the trier of fact. Even if we totally discount Evans’ statements, which are discussed in detail infra, the other evidence presented at trial is sufficient to conclude that the defendant was a principal to a deliberate and retaliatory drive-by shooting which was aimed at the young man who was wounded, but which also resulted in the senseless death of Ms. Wiley.
This assignment of error lacks merit.
USE OF CODEFENDANT’S STATEMENTS
In this assignment of error, the defendant asserts that he was denied his right *438 of confrontation when the state referred to the substance of Evans’ second police statement during its rebuttal closing argument, wherein the state claimed that the statement was the “ringing evidence” in the case. The defendant also complains that the trial court erred in instructing the jury that they could consider the substance of Evans’ prior statements.
The state contends that Evans’ second statement to the police was used during closing argument to attack the credibility of Evans’ written statement. The state utilized Evans’ second statement to simply note the differences in the statements, thereby attacking Evans’ credibility. The state further argues that the defendant did not timely object to the state’s closing argument or the jury instructions.

Evans’ statements

On the night of the offense, Evans gave two statements to the police. In the first one, he told numerous versions of what happened. He initially said he was not involved and that a cousin had borrowed his gun two days before the shooting. In the next version, he claimed that a bunch of kids surrounded the vehicle he and his uncle were in and that he fired twice after hearing a shot. He asserted that he was “shooting to avoid a situation.” He said he threw the gun in the river. He stated that his uncle had nothing to do with the incident; they just happened to be together at the time. Later in the first statement, he said he left the gun in the vehicle the day before. His uncle took it out of the back and told him “here’s your gun, make sure you take it to the house.”
In Evans’ second statement, which was given after the police took the defendant’s first statement, he recounted a crowd blocking the street. Girls were pounding on the vehicle and a “dude” was hollering “if you got your gun, you better shoot it.” When they returned down the street, he was going to get out of the truck and fight, but he heard a gunshot and got his gun from his uncle.
According to Evans, his uncle wanted to go back to “see what they gonna do.” After the first confrontation, his uncle took him to the store to get cigarettes. When he came out of the store, his uncle had his gun and told him that he could use it here if he got into any trouble. Evans said after he got his gun from his uncle, he put it in the middle console. He stated that his uncle told him, “I got your back one hundred percent, however you feel.” Evans recounted that the defendant also said “if you gotta use it, you can use it, you know; don’t be stupid; it’s only if you need to use it.” After the shooting, his uncle took him home but did not yell at him or shake him. All his uncle said to him was that he didn’t know Evans was going to shoot.
In January 2008, Evans wrote a letter in which he asked that all charges against the defendant be dropped because he did not know what was going to happen.
At trial, Evans declined to testify. The defendant moved to admit Evans’ January 2008 letter into evidence. In response, the state sought to admit his two prior statements to the police, which were inconsistent with each other and the letter. The trial court granted both sides’ motions, specifically providing that Evans’ two statements to the police were admissible to attack his credibility under La. C.E. art. 806. The defendant filed a writ application in this court challenging that ruling. We concluded that the trial court correctly determined that the evidence was admissible under La. C.E. art. 806.

Law

La. C.E. art. 806 states:
When a hearsay statement, or a statement defined in Article 801(D)(2)(C) or *439 (D)(3), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declar-ant had testified as a witness. Evidence of a statement or conduct by the declar-ant at any time, offered to attack the declarant’s credibility, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as a witness identified with an adverse party.
In relevant part, La. C. Cr. P. art. 841 provides:
A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to h ¿rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
La. C. Cr. P. art. 841 applies to alleged errors during closing arguments. State v. Williams, 46,674 (La.App.2d Cir.12/14/11) 81 So.3d 220. It also applies to any errors in jury charges. State v. Belgard, 410 So.2d 720 (La.1982); State v. Robinson, 45,820 (La.App.2d Cir.1/26/11) 57 So.3d 1107, writ denied, 2011-0381 (La.9/16/11), 69 So.3d 1141.

Discussion

Evans’ statements to the police on the night of the offense were admissible at trial to attack the credibility of his written statement made in January 2008. After the defense admitted Evans’ written statement in an attempt to prove that the defendant had no knowledge that Evans would fire his weapon, the state properly introduced Evans’ statements to the police which contradicted that assertion. When the state was preparing to provide a redacted version of Evans’ statements, so that only the relevant portions which contradicted his written statement would be disclosed to the jury, the defense agreed to play the entirety of Evans’ statements to the jury. Thereafter, the defense cross-examined the lead detective about the substance of Evans’ statements to police. The defense never objected to the state’s reference to the substance of the statements during closing arguments. Additionally, the defense never objected to the jury instructions. Therefore, under La. C. Cr. P. art. 841, the defendant is precluded from complaining about the state’s closing argument or the jury instructions on appeal.
This assignment has no merit.
LAW OF PRINCIPALS IN STATE’S CLOSING ARGUMENT AND JURY INSTRUCTIONS
The defendant contends that the state’s closing argument and the trial court’s jury instructions on the law of principals may have confused the jury and improperly allowed it to find him guilty of second degree murder without the requisite proof of specific intent and on the basis of “impeachment evidence” alone.
The defendant never timely objected to any portion of the state’s closing argument. Additionally, he was given ample opportunity to review and object to any of the proposed jury instructions; he explicitly stated that the instructions were acceptable. Therefore, under La. C. Cr. P. art. 841, the defendant cannot raise these alleged errors on appeal.
This assignment of error lacks merit.
*440 BATSON CHALLENGE
In this assignment of error, the defendant contends that the trial court erred in denying his Batson challenge, asserting that he demonstrated a prima facie case of discriminatory strikes on behalf of the state. He points out that 11 of the 12 peremptory challenges utilized by the state were against African-Americans. The defendant also alleges that there are ample circumstances to raise an inference that the state’s peremptory strikes were used on prospective jurors based on the fact that they were African-American. In support of his claim, he alleges that there were no adequate race-neutral reasons for the state to strike four particular prospective African-American jurors. He requests a remand for an evidentiary hearing at which the prosecutor would be required to provide reasons for the peremptory strikes of African-American jurors.

Law

It is well settled that the use of peremptory challenges based solely on a juror’s race is prohibited. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Louisiana law codified the Batson ruling in La. C. Cr. P. art. 795.
The three-step Batson process was described in Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), as follows:
A defendant’s Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]
To establish a prima facie case, the objecting party must show: (1) the striking party’s challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the peremptory was used to strike the venireper-son on account of his being a member of that cognizable group. If the trial court determines the opponent failed to establish the threshold requirement of a prima facie case (step one), then the analysis is at an end and the burden never shifts to the proponent of the strike to articulate neutral reasons (step two). State v. Nelson, 2010-1724 (La.3/13/12), 85 So.3d 21.
In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, the supreme court outlined a multifactor approach for determining whether a prima facie case has been made:
The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible consider *441 ations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
No formula exists for determining whether the defense has established a pri-ma facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venirepersons has emerged during voir dire but also whether the prosecutor’s questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. State v. Jacobs, 1999-0991 (La.5/15/01), 803 So.2d 933, 958, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002). Batson accords a trial court considerable flexibility and broad discretion in this regard because “trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor’s use of peremptory challenges create a prima facie ease of discrimination against black jurors.” Batson, 476 U.S. at 97, 106 S.Ct. at 1723; State v. Jacobs, supra.
Bare statistics alone are insufficient to support a prima facie case of discrimination. Furthermore, the value of numbers alone, without any indication of the race or gender composition of the jury selected or the pool from which it was drawn, is limited at best. State v. Holand, 2011-0974 (La.11/18/11), — So.3d -, 2011 WL 6153193, cert. denied, — U.S. -, 132 S.Ct. 2682, 183 L.Ed.2d 48 (2012).
The trial court plays a unique role in the dynamics of voir dire, for it is the court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. See State v. Jones, 42,531 (La.App.2d Cir.11/7/07), 968 So.2d 1247.
The trial court’s determination that the defense failed to set forth a prima facie case of purposeful discrimination merits great deference on appeal. State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir.1991), writ denied, 594 So.2d 1317 (La.1992). The trial court’s ruling regarding whether there was any discriminatory intent in the state’s peremptory challenges is reviewed with great deference. State v. Robinson, 46,737 (La.App. 2d Cir.12/14/11), 79 So.3d 1270, writ denied, 2012-0487 (La.8/22/12), 97 So.3d 378.
|21 Voir dire proceedings
At the conclusion of jury selection, the defense made a Batson challenge, noting that almost every peremptory challenge used by the state was utilized to remove African-American prospective jurors. The state then raised a reverse-Batson challenge based on the defense’s removal of Caucasian prospective jurors. The trial court noted that the jury was composed of five Caucasians and seven African-Americans; the alternates were one Caucasian and one African-American. Each party had used all 12 of its peremptory challenges. Based on the fact that seven of the jurors were African-American, the trial court determined that there was no prima facie showing that the peremptory challenges by the state were made on the basis of race.
Counsel for the defense stated that he had to “burn up all of my peremptory challenges to balance out this particular situation.” Based on the defense’s claim that it had to “balance out” the jury, the trial court found a prima facie case that the defense had used its peremptory chai- *442 lenges to exclude prospective jurors on the basis of their race. The defense was then required to give race-neutral reasons for its peremptory challenges against Caucasian prospective jurors. The defense’s reasons for excusing two prospective Caucasian jurors were based on their “body language” and “unresponsive” answers. The trial court indicated that the defense’s race-neutral reasons for challenging these two prospective jurors were weak, but denied the reverse-Batson challenge.
Both parties requested a stay in the case in order to seek supervisory review of the trial court’s rulings. This court denied both writ applications on the showing made. The state sought supervisory review with the Louisiana Supreme Court, which granted the writ application and remanded the matter to the trial court for reseating of the two Caucasian prospective jurors. See State v. Mason, 2011-1866 (La.8/29/11), 68 So.3d 513. This caused the composition of the jury to change to five African-Americans and seven Caucasians as the last two jurors to be accepted on the panel, both of whom were African-American, were removed. However, the parties agreed to accept the two of them as the alternates. The defense’s motion for mistrial was denied.

Discussion

We find that the trial court did not err in denying the defendant’s Batson challenge because he failed to present a prima facie case of racial discrimination. The defendant’s only evidence to raise the inference of discrimination was the state’s use of 11 of its 12 peremptory challenges to excuse African-Americans. However, at the time the defendant made his challenge, a majority of the jurors, seven of the 12, were African-American. The state also agreed to have an African-American as one of the two alternates.
Furthermore, our review of the transcript of the voir dire proceedings does not reveal any inference of racial discrimination on the part of the state during voir dire. In fact, although the state was not required to provide race-neutral reasons for its challenges, the record discloses race-neutral reasons for a majority of the jurors struck by the state, including the ones cited by the defendant in his brief. Mandel Davis was the victim of a burglary who was dissatisfied with the state’s handling of the case; he also had a relative who was serving time in prison for a drug charge. Marcus Clark had a family member who was incarcerated for carrying a firearm as a convicted felon. Joyce McGaskey stated during voir dire that she was concerned that she had been told at work that she would not be paid while she was serving as a juror and she had concerns about paying her rent. Herbert Lee Dotson exhibited some confusion about the burden of proof.
This assignment of error is meritless.
CONCLUSION
The defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The evidence indicates that there was at least one young child with the group.

. Evans also told the police where he hid the gun; it was recovered, and ballistic testing confirmed that it was the murder weapon.

. He described the console as not being enclosed and as having a shelf upon which the gun was placed.