BROWN, Chief Judge.
| defendant, Linda Kate Keeney Passan-iti, was indicted as a principal to second degree murder, in violation of La. R.S. 14:24 and 14:30.1 (count one); with conspiracy to commit second degree murder, in violation of La. R.S. 14:26 and 14:30.1 (count two); and with three counts of principal to forgery (forgeries of a financial power of attorney, a health care power of attorney, and a will), in violation of La. 14:24 and 14:72.
A jury returned a verdict of guilty on all charges. Defendant’s motions for post-verdict judgment of acquittal and new trial were denied. She was sentenced to life imprisonment at hard labor without benefits on count one; 30 years at hard labor without benefits on count two; and 10 years at hard labor without benefits on each of counts three, four, and five. The sentences were imposed consecutively. Defendant has appealed. For the following reasons, defendant’s convictions are affirmed, her life sentence without benefit of parole is affirmed and the sentence for counts two, three, four, and five are amended only to the extent that the parole restrictions are deleted.

The Players

Ernest Luttrell, a hay farmer, owned 60 acres of land in Keithville, Louisiana. On July 25, 2010, the 73-year old Luttrell was shot to death in his home by Eric Crain. To avoid the possibility of capital punishment, Crain pled guilty to first degree murder with a sentence of life imprisonment without the benefit of parole and agreed to testify at defendant’s trial.
Tina Vanmoerkerque lived on the Lutt-rell property; she lived with Chris Tope, her boyfriend, in a small camper trailer behind the Luttrells’ 12home. Chris worked as a handyman and Tina worked as a housekeeper and personal assistant to Loretta Luttrell. Initially charged with first degree murder, Tina Vanmoerkerque pled guilty to second degree murder with a *1223 sentence of life imprisonment without the benefit of parole and agreed to testify at defendant’s trial.
Co-conspirator, Loretta Bobbie Moore Luttrell (Ernest’s domestic partner — they were not married but lived together for more than 50 years) was arrested and charged with the first degree murder of Ernest. Both Ernest and Loretta had been diagnosed with dementia. After her arrest, Loretta was diagnosed with severe Alzheimer’s disease and declared mentally incompetent. Loretta is now housed in a facility for Alzheimer’s patients. Defendant, Linda Kate Keeney Passaniti, is Loretta’s daughter.

Discussion

Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to convict her. In the opening statement to the jury and in brief before this court, defendant admits guilt on count five, the forgery of Ernest Luttrell’s 2010 testament. Specifically, defendant claims that the only evidence that she “masterminded the scheme .to kill Ernest Luttrell” came from two witnesses, Tina Vanmoerk-erque and Tawanda Daughtry, who she asserts were not credible. Tina’s testimony was that Loretta had her hire Eric Crain to kill Ernest for $1,000; Daughtry was a cellmate of defendant who testified to conversations with defendant wherein she confessed to the crime.

|aThe Agreement to Kill Ernest

Tina testified that sometime during the spring of 2010 she heard the following statements made by defendant and Loretta during phone conversations (the speaker phone was on):
• defendant needed money;
• defendant instructed Loretta that if putting “him” in a nursing home does not work, she was to tell Tina to get the hit man to kill Ernest;
• Loretta said that she agreed;
• Loretta stated that she would speak to Tina about hiring a contract killer;
• defendant instructed Loretta that she needed to put more pressure on Tina to find a hit man;
• Loretta stated that Tina knew a hit man to take care of Ernest.
Loretta told Tina to find someone who would kill Ernest for $1,000 or she would be thrown off the property; she also gave Tina one of Ernest’s handguns.

Ernest’s Murder

On July 24, 2010, Tina ran into Eric Crain, the ex-boyfriend of her daughter, at a convenience store. According to Crain, they talked and made plans to hang out later that evening. The two met at a McDonald’s Restaurant on Mansfield Road and while they were driving around, Tina asked him if he wanted to make some “quick money.” She told Crain that:
• she needed him to kill her employer’s husband;
• Loretta, the intended victim’s wife, would pay him $1,000;
k!» she . (Tina) and her employer’s husband were “having a confrontation.”
Crain agreed when he found out there was money involved, and Tina called Loretta to tell her that she had someone to do “the job” and that she would call her in the morning. Crain testified that his willingness to participate in Ernest’s murder could have been based in part on the large amount of alcohol and drugs he had ingested during the course of that day and into the next one. He and Tina ordered pizza, “one thing led to ánother” and they had sex. They drank together, he took some more pills, and Tina had to go out around 2:00 a.m. to deal with her boyfriend, who was threatening to throw her out of their trailer.
*1224 During their time together at the motel, Tina gave him a snub-nosed chrome .44 magnum revolver[1] that she said was hers, along with the following instructions:
• the killing would occur the next day;
• Loretta would be leaving to go to church early;
• Tina would drive him to the Luttrell home and drop him off;
• he was to enter through the side gate of the home;
• Loretta would leave the side door unlocked and turn the house alarm off;
• Ernest would either be asleep or in his recliner watching TV;
• he was supposed to make it look like a robbery;
k* he was supposed to take Ernest’s guns from the gun safe, his keys from a bowl on the kitchen counter, and his truck.
Tina told him to take the truck since she was dropping him off. After he was finished, Crain was to meet Tina at the Wal-mart on Pines Road. Crain testified that Tina told him that this information was from Loretta, but he did not ever speak to Loretta. He also testified that Tina never mentioned defendant’s name or alluded to her identity. The only names he heard regarding Ernest’s murder were Tina’s and Loretta Luttrell’s.
Tina testified that on the morning of Sunday, July 25, 2010, she called Loretta to tell her they were on their way. Loretta told Tina she was about to leave the house to go to church. On the drive to the Luttrell home, Tina and Crain talked through the scenario one more time. Tina dropped Crain off at the mailbox at the driveway to the Luttrell residence. Crain testified that he entered the house, shot and killed Ernest, and stole his keys, four guns and his truck. Dr. James Traylor, an expert in forensic pathology, testified that Ernest died from six gunshot wounds.
Crain was quickly arrested. While in jail, he called his boss and admitted to killing Ernest Luttrell, unaware that a news crew was present at his place of employment and recording his phone call on live air. Tina was arrested shortly thereafter. Both were charged with first degree murder, as was Loretta Luttrell (but as noted previously, because of her advanced dementia, she was declared incompetent to stand trial and remains in a treatment/nursing facility).
| (Mineral Rights Sale
In 2008, Ernest sold the mineral rights to his 60-acre tract for $400,000, purchased a $300,000 annuity in his and Loretta’s name (with the surviving owner listed as the beneficiary of the annuity) and some CDs. He paid off the remaining balance of a loan, and deposited the remainder of the funds into accounts jointly owned with Loretta.
Loretta’s half-sister, Rosie Jones, testified that defendant called her, upset about the sale of the mineral rights. Defendant asked Rosie if she could help defendant talk Ernest and Loretta out of the deal. According to defendant, they could make more money if they would wait. Rosie said that defendant was “really angry, frustrated, very upset” about Ernest’s sale because she wanted Ernest’s home and land; Kimberly Passaniti, defendant’s daughter, was also upset about the sale because she had been told she would be getting Ernest’s land and she wanted it to *1225 include the mineral rights. Tina testified that defendant and Kimberly refused to talk to Loretta for a long time because of the sale.

The 2008 Notarial Testaments

On April 24, 2008, Ernest and Loretta prepared notarial testaments. In their wills, each provided that should he or she die first, the surviving partner was to receive everything. Both testaments stated that if Ernest and Loretta were to die at the same time, Rosie Jones would inherit the land and defendant and Kimberly would inherit the money. Ernest also told Rosie and her husband that, should anything happen to him and Loretta, they needed to go to the house as soon as possible and secure the wills. Ernest |7gave them the alarm code to the house as well as the safe combination and the business card of the attorney who had prepared the wills. Ernest did not trust defendant and her husband, Tony, and advised Rosie not to talk to them about anything and not to trust anything either of them said.

Change in Defendant’s Financial Condition

Some time in 2008, defendant quit her job as a professor at a local college in San Antonio and adopted a four-year-old child. She taught chemistry and mathematics at various universities. Her husband later lost his job in 2009. This put them in financial straits. Defendant allegedly has a bachelor’s degree in chemistry, as well as masters’ and doctoral degrees in applied mathematics from Johns Hopkins University. Tony Passaniti received a military retirement and had worked as a physician’s assistant once he retired from the Air Force.
Kimberly Passaniti testified that Ernest, sometime between 2008 and 2010, promised to pay off a $70,000 debt she had accumulated in student loans.[2] However, he refused to honor this commitment. Kimberly testified that she was not mad about it, and she did not remember “anything significant” about her mother’s reaction to the news. On the other hand, Rosie testified that Loretta was aggravated about Ernest’s refusal to pay off Kimberly’s student loans. She told Rosie that Ernest had agreed to pay Kimberly’s tuition, then later said that he wasn’t going to pay it, but would give her $1,000. Rosie also testified that Loretta called her in June of 2010 |sto express concern about Mildred Jackson, Ernest’s sister. Loretta told Rosie that defendant, Loretta, and Kimberly, were mad because they thought that Ernest was going to give “everything” away to Mildred. For that reason, Loretta tried to prevent Ernest from visiting his sister or her son.

Diagnosis of Dementia

In 2009, Ernest and Loretta visited Dr. James May to be tested for dementia. Dr. May, an expert in the field of family medicine and a board certified practitioner, testified that both had mild dementia, but Loretta’s condition was significantly more pronounced. He prescribed Aricept, a medication which slows the rate of dementia, to Ernest. Tina testified that Loretta was responsible for giving Ernest his morning and evening medications. Tina worked for Loretta for approximately five years. During that time, Loretta’s condition deteriorated to the point where she was dependent upon Tina for almost everything.

*1226
Phone Conversations

In 2010, not long before Ernest’s murder, defendant learned about the wills Ernest and Loretta had written in 2008. Tina testified that defendant was furious when she found out that Rosie would get the land and she and Kimberly were to get the money. Tina overheard several phone conversations between defendant and Loretta, who often talked with her phone on “speaker” mode:[3]
}⅜* defendant stated that she wanted more and instructed Loretta to change her will;
• defendant stated that she wished that Ernest was dead;
• defendant told Loretta to increase Ernest’s Lortab and take away his Ari-cept to “drive him crazy or kill him;”
• defendant stated that Ernest would “be better off dead.”
During one of these conversations, Loretta told defendant that if Ernest were dead, she could pay off Kimberly’s college expenses. According to Tina, both Loretta and defendant were angry that Ernest had reneged on his promise to pay off Kimberly’s school loans.
Rosie testified that when defendant found out about the 2008 wills executed by Ernest and Loretta, she called her some time during the last week of June 2010 to question Rosie about the details of these wills. Defendant, who was agitated and upset, told Rosie that it was Loretta who told her about the wills. Defendant told Rosie that she was angry that Rosie herself had not told her about the testaments. When Rosie told defendant that she did not want anything from Ernest and Loretta, but would “sign her rights away,” defendant calmed down and her attitude and tone changed. Defendant called her several times, as did Loretta and Kimberly, asking her to sign something renouncing her inheritance (under the 2008 wills). Nothing was done, and then after the murder of Ernest, when Loretta was arrested, defendant called Rosie again asking her if she would sign a document that renounced “her rights” to the Luttrells’ property.
| inThe Health Care and Financial Power of Attorneys
Defendant mailed Tina a power of attorney (“POA”); Tina testified that she, Loretta and defendant forged a health care POA (“HCPOA”) for Ernest. The state entered a copy of this document into evidence; it designates defendant as having POA over the health care of Ernest Lutt-rell, is dated April 14, 2010, and is notarized by Ronald Norman. Tina testified that she signed as a witness, forged her own daughter’s name as the other witness, and saw Loretta sign Ernest’s initials and his name at the end of the document. Tina was adamant that Ernest never signed this or any other document that she signed as a witness for Loretta. Tina testified that she drove Loretta to Norman’s store to have this POA notarized. Norman testified that he notarized the POA documents in the instant case without reading them and without requesting identification. He further stated that when he notarized the April 14, 2010, HCPOA, Loretta was alone when she came into his store; neither Ernest nor any witnesses were present.
Tina testified that while there was more than one HCPOA, she only participated in one forgery. Tina identified Loretta’s handwriting on another HCPOA, and not *1227 ed that she was familiar with Loretta’s handwriting because she saw it every day.
Tina also identified, written in defendant’s handwriting, Ernest’s initials and name on another HCPOA. She stated that she knew defendant’s handwriting from the letters defendant mailed to Loretta. Norman testified that he “signed” this same document without seeing Ernest or the witnesses sign, but stated that he did not “generate” this form; he also testified that he |nhad never met or seen defendant. This HCPOA document was later discovered during the search of defendant’s San Antonio home.
Tina identified defendant’s handwriting on a financial POA (“FPOA”) which is dated March 10, 2010. Norman testified that he notarized this document on March 10, 2010, in the presence of a man he was told was Ernest Luttrell, Loretta, and two witnesses, but that he only saw the man he thought was Ernest sign the document, not the witnesses (neither of which was defendant). According to Tina, defendant signed Ernest’s name to this document, as well as the names of the two witnesses, who were Tina and Tina’s daughter, Stacey Dew.
Tina identified Ernest’s name in defendant’s handwriting on two other FPOAs. Norman noted that his signature was on a second FPOA, but stated that he neither signed it nor wrote Ernest’s social security number on it. Norman testified that he only notarized one financial document for Ernest and one for Loretta, and was unable to explain the subsequent documents. Norman identified his name on another FPOA, but stated that he did not remember notarizing this document either. He was adamant that he only notarized one FPOA for Ernest Luttrell. According to Tina, defendant also forged a FPOA for Loretta, and she forged Tina’s name on that document because Tina did not sign a FPOA for Loretta. This FPOA was dated March 10, 2010, and was notarized by Ronald Norman.
Kimberly testified that defendant told her that she had power of attorney over Ernest’s financial affairs. Defendant told her she also had power of attorney over Ernest’s health care because he had been diagnosed |12with Alzheimer’s and dementia and was starting to threaten the neighbor and cause problems. Defendant also related to her that she had financial power of attorney over Loretta’s affairs. According to Kimberly, her mother’s reasoning was that both grandparents needed more assistance and care than they were getting.

Ernest’s Commitment

On April 30, 2010, David Ivey, a neighbor with whom Ernest had been arguing over property boundaries, received a call from Loretta, who told him that Ernest had taken one of his guns and gone to the back of their property after telling her that he was going to shoot David Ivey. At that time, Ivey called the sheriffs substation to report the threat as relayed by Loretta. Because Ernest had made a similar comment in the presence of one of the deputies previously, officers responded and took Ernest to LSUHSC-Shreveport and he was admitted to the psychiatric ward.
While Ernest was committed, Tina, Loretta, and defendant visited, among other facilities, Pierremont Nursing Home to check into having Ernest transferred to the facility’s secure Alzheimer’s unit. According to Tina, defendant wanted Ernest “put away” so he couldn’t give his money or property to his sister, Mildred Jackson. On May 5, 2010, a staff member from Pierremont called Ella Bradford, the case manager at LSUHSC, and informed her that Ernest’s wife and daughter wanted him transferred to their facility; Ms. Bradford refused to release any informa *1228 tion to the caller because no such release was authorized by the patient. Defendant also Impersonally told Ms. Bradford that she wanted Ernest transferred to Pierre-mont.
On May 7, 2010, defendant called Dr. May and told him that she had HCPOA of Ernest and that she wanted Ernest to be placed in an Alzheimer’s Unit in a nursing home. The staff at LSUHSC, however, found nothing sufficiently wrong with Ernest that warranted his transfer to a nursing home. That same day, Ernest was discharged and released home, unaware of defendant’s or Loretta’s actions.
Rosie testified that during Ernest’s commitment at LSU, Loretta called her about Mildred and expressed concern that Mildred would “get everything” if something happened to Ernest. Mildred told Rosie that LSU would not let Mildred or defendant visit Ernest, and that they would not accept defendant’s HCPOA. Defendant also called her during Ernest’s time at LSU. She told Rosie that she had Ernest’s HCPOA and wanted to put “everything” in Rosie’s name. Rosie testified that she turned defendant down flat, and this subject never came up again.

Ernest’s Accounts

Betty Jones, a manager at Capitol One, testified that defendant and Loretta visited her on May 5, 2010 (which is during the time of Ernest’s commitment at LSUHSC), and that the following transactions occurred:
• defendant presented an FPOA allegedly executed by Ernest Luttrell dated March 10, 2010;
• defendant closed Ernest and Loretta’s joint accounts, withdrew money from a CD, and transferred the money into accounts listing Loretta’s name only, and made defendant’s San Antonio address as the primary address for the account;
|i4* Loretta closed an account and withdrew money from a CD;
• the $300,000 annuity was not disturbed;
• $24,535.69 was transferred from an account under Ernest’s control, which left him with a balance of $397.37.
Ms. Jones described Loretta as being very upset, a little bit weak and fragile, “not getting around as well as she always had,” and defendant as clearly being in control of the situation. Ms. Jones was given the following explanation:
That Mr. Luttrell was in the hospital, that Ms. Luttrell was not allowed to go and see her husband. Her — Mr. Lutt-rell’s sister — that they felt that the sister was trying to get to his money and that by taking his name off of anything, it would prevent the possibility of maybe the sister getting a power of attorney and having access to the funds. So if it was strictly in Loretta’s name, that would prevent that.
Tina testified that she and Loretta made ATM withdrawals of money from Ernest’s account during and after his commitment. Ernest wrote a check on May 12, 2010; the check later bounced. On May 13, 2010, Loretta called Ms. Jones and requested that the former accounts be restored so Ernest would not know what she and defendant had done while he was in the hospital.

After Ernest’s Funeral

Loretta was arrested immediately following Ernest’s funeral. Defendant stated in a television interview that Loretta could not have planned Ernest’s murder because she was in an advanced state of dementia. Rosie testified that defendant began harassing her about giving her the documents and money Loretta and Rosie took from Ernest’s safe | ^immediately after his *1229 death. She also made threatening phone calls to Rosie demanding that she sign over her “rights” and stay away from the Luttrell home. Rosie stated that she was afraid of defendant because of her erratic behavior and threats, but because defendant was back in San Antonio and she was in Arkansas, she was unable to get a restraining order against her. Money from Ernest’s account continued to be withdrawn after his death and after Loretta’s arrest and incarceration, sometimes on a daily basis and on some occasions two and three times a day.

Ernest’s 2010 Will

A will purportedly executed by Ernest on July 1, 2010, was filed by an attorney representing defendant into the civil succession proceeding involving Ernest’s estate which had been instituted shortly after Ernest’s death. This filing raised the suspicions of Investigator Don Ashley because the attorney who filed it did so with a disclaimer that he could not vouch for the truthfulness or validity of the will he filed. Inv. Ashley contacted the notary of this will, Penny Penner, who admitted that on October 2, 2010, defendant visited her to notarize three copies of a “Last Will and Testament of Ernest Luttrell” and a “Last Will and Testament of Bobbie Loretta Moore Luttrell,” both of which were dated July 1, 2010, and already signed. Penner admitted that she notarized the documents even though the dates on them were three months prior to the date that defendant brought them to her and without requiring the presence of Loretta or Ernest Luttrell. In fact, she knew that Ernest was dead and that Loretta had been arrested and charged with his murder. During her testimony at trial, Penner stated that defendant 11fitold her she was having these wills notarized “after the fact” because she did not want her mother to lose everything while she was in jail. Penner testified that she thought she was helping Mrs. Loretta. Defendant told her that Ernest and Loretta had actually signed the wills in July, but just had not completed the process before Ernest’s death. This will left everything to Loretta and if she died everything would go to defendant and defendant’s children; in the 2008 wills Ernest and Loretta executed, should they die at the same time, the property would go to Rosie Jones and the money was to go to defendant and her children.
According to Penner, she decided not to lie for defendant anymore because “this was about a murder.” Penner agreed to have her phone conversations with defendant recorded. Recordings of these phone calls were entered into evidence and played for the jury. Penner also turned over to Inv. Ashley an unopened envelope addressed to Penner from defendant, which contained a copy of a handwritten letter in which defendant laid out the scenario of what Penner was to say happened the day the wills were allegedly signed should she be questioned by authorities, as well as photographs of Ernest, Raquel Martinez (defendant’s friend and the other witness to the forged wills), and Jessica (defendant’s adopted daughter) for recognition purposes should the authorities ask her questions about the persons present for the signing of the wills.
After she was indicted by the Caddo Parish grand jury, defendant was arrested at her home in San Antonio, Texas. Defendant’s home was searched twice and the following items were recovered:
|i7* the original letter and original photographs mailed to Penny Penner;
• Ernest’s military flag, which was thrown into a corner in the defendant’s garage;
• a handwritten map of Ernest’s home with information not published to the public (according to Inv. Ashley, this *1230 was a diagram of the Luttrell home and items that were marked or identified on it were pertinent to the case or murder scene. Eric Crain during his testimony stated that he never saw a diagram or handwritten map);
• a receipt for $373 from the Caddo Clerk of Court’s Office for an August 2 order for 11 certified copies of a POA and 100 copies of another POA;
• a computer-generated receipt showing that the Passanitis had ordered a POA document from “Legacy Writer” for a POA for Loretta;
• handwritten notes made by defendant;
• a letter from defendant’s husband written to the IRS and dated May 27, 2010, stating that he and defendant were currently unemployed, that he had been looking for work, and that he was sending $100.00 to pay the interest on money they owed (this corroborated information from other sources about defendant and her husband’s unemployment, which apparently began early in 2010 and coincided with defendant’s sudden renewal of a close relationship with her mother Loretta);
• several copies of FPOAs for Ernest Luttrell with different and inconsistent signatures that were clear forgeries were found in defendant’s home;
• several copies of HCPOAs for Ernest Luttrell with different, traced over, or forged signatures were found in defendant’s home.
Tawanda Daughtry, an inmate at the Caddo Correctional Center in the same “pod” as defendant, testified that defendant told her the following information in May 2012:
• she was in jail accused of arranging her stepfather’s murder;
|,s* her stepfather had a lot of land and money from the Haynesville Shale;
• he was dead so “they” could collect the profits;
• she was going to beat the murder charge because she was nowhere near Louisiana when the murder took place and they would never be able to convict her of murder;
• she had made the documents on her computer from a website her husband showed her;
• if she was convicted of anything it probably would be the forgery charges; if so, all they would give her was probation, something that did not worry her;
• she was trying to hide from the DA’s office the fact that she had money;
• she wanted a handwriting expert so she could “switch” her handwriting that even an expert couldn’t tell;
• she initially wanted to slowly poison Ernest but changed her mind because poison could be detected in his blood;
• her mother’s half-sister Rosie came up with the idea to make it look like Ernest was killed during a home invasion;
• they offered $1,000 to have Ernest killed;
• if everybody would have just shut up and not talked then nobody would have been in jail;
• it was her plan to deny everything and put it all on her mom, who was unable to stand trial, and Rosie;
• she was “sunk” if the district attorney was listening to her phone calls;
• she told her “hired help” to shoot Ernest twice in the head to make sure that he was dead;
• she referred to the people who were hired as Tina and the “lawn guy” or Crain, a guy whom Tina was also sleeping with although she already had a boyfriend;
*1231 Im» at first they considered involving Chris, Tina’s boyfriend, but he was too scared and wanted nothing to do with “it;”
• she had money problems which was the primary reason behind Ernest’s murder;
Tawanda stated that she has been relocated to several correctional facilities because defendant threatened to kill her for cooperating with authorities and had other inmates make threats as well. She further stated that she was reluctant to testify because she feared for her family’s safety because of all that defendant told her and the threats that were made against her.
Robert Foley, an expert in handwriting analysis, testified that he analyzed FPOA and HCPOA documents and a will dated July 1, 2010, compared them with several documents known to have been signed by Ernest Luttrell, and concluded that Ernest did not sign these documents. Foley noted “voluminous” differences between the known samples and the questionable ones. Foley had an investigator obtain handwriting samples from defendant. He observed that defendant intentionally distorted her own handwriting for her requested sample, and he could not reach a definitive conclusion whether the signatures on the POAs (or will) were made by defendant. However, Foley did testify that defendant’s samples did not appear to be natural at all, but were so distorted that they could not be used for comparison. He felt that defendant’s intentional distortion was made solely to thwart his ability to compare her handwriting with the signatures on the documents at issue.
12pThe standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert, denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.01/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/06/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Dorsey, 10-0216 (La.09/07/11), 74 So.3d 603, cert, denied, — U.S.-, 132 S.Ct. 1859,182 L.Ed.2d 658 (2012). A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.08/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. An individual may only be convicted as a principal for those crimes for which he or she personally has the requisite mental state. State v. Mason, 47,642 (La.App. 12i2d Cir.01/16/13), 109 So.3d 429, writs denied, 13-0423 (La.07/31/13), 118 So.3d 1116, 13-0300 (La.09/13/13), 120 So.3d 279.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1A(1). Specific intent is that state of mind which exists when the circumstances indicate *1232 that the offender .actively desired the proscribed criminal consequences to follow his act or his failure to act. La. R.S. 14:10(1); State v. Scott, 42,871 (La.App.2d Cir.12/19/07), 973 So.2d 927, writ denied, 08-0350 (La.11/10/08), 996 So.2d 1060. To support a conviction as a principal to specific intent second degree murder, the state must show that the defendant had the specific intent to kill or inflict great bodily harm; the mental state of one defendant may not be imputed to another defendant. State v. Scott, supra.
Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination. La. R.S. 14:26. If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other. Specific intent is an essential element of the crime of conspiracy. Louisiana State Bar Association v. Pitard, 462 So.2d 178 (La. p-985) -22 Proof of a conspiracy may be made with direct or circumstantial evidence. State v. Brown, 398 So.2d 1381 (La.1981).
La. R.S. 14:72 provides that:
A. It shall be unlawful to forge, with intent to defraud, any signature to, or any part of, any writing purporting to have legal efficacy.
B. Issuing, transferring, or possessing with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute a violation of the provisions of this Section.
Principal to Second Degree Murder Conviction
The first issue is whether any rational trier of fact could have found the essential elements of the crime of principal to second degree murder proven beyond a reasonable doubt. As noted above, the state presented its case for principal to second degree murder under a theory of specific intent.
Based on the testimony of Tina Vanm-oerkerque and Tawanda Daughtry and corroborating evidence, the jury reasonably found that defendant actively desired the prescribed criminal consequences to follow from her acts. La. R.S. 14:10(1); State v. Scott, supra. In addition, the jury, and not this court, is given the duty of assessing the credibility of witnesses and the weighing the evidence. State v. Dorsey, supra; State v. Gilliam, supra.
In looking at the principal component, evidence of defendant’s control and manipulation of her mother demonstrates that she was concerned in the commission of Ernest’s murder by the direct or indirect counseling or procuring of another to commit the crime. In weighing this evidence, along with evidence about the handwritten map found in | ¡^defendant’s home, the jury could reasonably have concluded based on the evidence that defendant shared with Eric Crain and Tina Vanmoerkerque the specific intent to murder Ernest Luttrell.
In viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found that the essential elements of the crime of principal to second degree murder were proven beyond a reasonable doubt.
Criminal Conspiracy to Second Degree Murder
Criminal conspiracy requires an agreement or combination of two or more *1233 persons for the specific purpose of committing any crime, an act in furtherance of the object of the agreement or combination, and specific intent. La. R.S. 14:26; Louisiana State Bar Ass’n, supra. The jury heard evidence that defendant instructed Loretta to ask Tina to find a hit man to kill Ernest. They also heard evidence of Loretta’s agreement to the plan; Tina’s recruitment of Eric Crain; and, Eric’s fulfillment of the murder pursuant to a detailed set of instructions provided to him by Tina (who herself was given details by Loretta). Defendant and Loretta entered into an agreement together for the specific purpose of killing Ernest, and Loretta’s act of directing Tina to find a hit man serves as an act in furtherance of their agreement. In viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of criminal conspiracy to second degree murder.
^Principal to Forgery of HCPOA and FPOA for Ernest Luttrell
The state presented three HCPOAs designating defendant as having power of attorney for Ernest Luttrell. Tina identified Ernest’s name and initials as being written in defendant’s handwriting on two of the HCPOAs, and testified that she, defendant, and Loretta participated in the forgery of one HCPOA. Rosie testified that defendant told her that she had POA over Ernest, but did not specify the type of POA to which she was referring. Kimberly testified that defendant stated that she had Ernest’s HCPOA. Ella Bradford, the social worker at LSUHSC, testified that defendant told her she had been given HCPOA over Ernest, and that a copy was left at the nurse’s station on the psychiatric unit. Dr. May also testified that defendant stated that she had HCPOA over Ernest.
The state presented three versions of FPOA designating defendant as Ernest’s representative. Tina identified Ernest’s signature written in defendant’s handwriting on all three documents. Kimberly testified that her mother had FPOA over Ernest. Betty Jones at the bank testified that defendant presented her with an FPOA for Ernest; this was one of the-documents that Tina testified was forged by defendant.
Robert Foley, the handwriting expert, testified that he analyzed the HCPOA and FPOA documents; Ernest clearly had not signed these documents, and defendant intentionally distorted her own handwriting to prevent a valid comparison.
In viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved beyond a ^reasonable doubt that defendant forged Ernest Luttrell’s signature on both POA documents with the specific intent to defraud others. State v. Satchfield, 35,631 (La.App.2d Cir.08/14/02), 824 So.2d 537. Although Foley could not definitively state that defendant forged Ernest’s signatures, this conclusion goes to the weight of the evidence. State v. Dorsey, supra. Furthermore, the jury found Tina’s testimony to be credible. State v. Gilliam, supra.
Accordingly, this assignment of error is without merit.

Excessive Sentence

Defendant argues that her sentences should have been ordered to run concurrently because the state presented her actions as being one scheme or transaction. No motion to reconsider sentence was made or filed in the instant case. When a defendant fails to timely file a motion to reconsider sentence under La. C. Cr. P. art. 881.1, the appellate court’s review is limited to the bare claim of constitutional excessiveness. State v. Mims, *1234 619 So.2d 1059 (La.1993); State v. Smith, 46,348 (La.App.2d Cir.06/22/11), 71 So.3d 485, unit denied, 11-1646 (La.01/13/12), 77 So.3d 950. Under constitutional review, a sentence can be excessive, even when it falls within statutory guidelines, if the punishment is so grossly disproportionate to the severity of the crime that it shocks the sense of justice and serves no purpose other than to inflict pain and suffering. State v. Fatheree, 46,686 (La.App.2d Cir.11/02/11), 77 So.3d 1047.
This court reviews “consecutive versus concurrent sentencing” arguments as part of constitutional excessiveness review. State v. Barnett,U 46,303 (La. App.2d Cir.05/18/11), 70 So.3d 1, writ denied, 11-1612 (La.04/13/12), 85 So.3d 1239.
Since defendant only contests the consecutive nature of her sentences and it is within the trial court’s discretion to order sentences to run consecutively rather than concurrently, the focus of the analysis is whether the trial court stated the factors considered and its reasons for the consecutive terms. La. C. Cr. P. art. 883; State v. Smith, supra.
Prior to issuing sentence, the trial court announced several reasons why consecutive sentences were being imposed, including defendant’s desire for Ernest to be killed and her manipulation of her mother, the notaries, and Tina. Jurisprudence does not demand that the trial court consider a certain set of factors, but only suggests some factors to assist in the court’s analysis. In this case, the court’s reasons demonstrate that it considered the gravity or dangerous of the offenses, the viciousness of the crimes, the harm done to the victims, and whether defendant constitutes an unusual risk of danger to the public. State v. Smith, supra.
Based on the circumstances of this case, defendant’s consecutively imposed sentences are not grossly disproportionate to the severity of the crimes she committed such that they shock the sense of justice or serve no purpose other than to inflict pain and suffering. State v. Fatheree, supra.
In conclusion, defendant’s sentence is not unconstitutionally harsh and therefore is not excessive.

\mError Patent Review

The trial court ordered that all of defendant’s sentences were to be served without the benefit of parole.
The “no parole” limitation does not apply to counts two, three, four, and five because La. R.S. 14:26(C) and 14:72(D) do not include any restriction against parole. We therefore delete the “no parole” language from these sentences.

Conclusion

For the foregoing reasons, defendant’s convictions are affirmed, the parole restrictions for counts two, three, four, and five are deleted, and defendant’s sentence is affirmed.

. Jeff Thomas, a crime scene investigator with the Caddo Parish Sheriff’s Office, testified that an empty Smith & Wesson .44 caliber revolver was later recovered and an Alcohol, Tobacco, and Firearm trace revealed that Ernest Luttrell was the registered owner of this gun.

. Kimberly has a bachelor's degree in chemistry, a master’s degree in chemical engineering, and was a second year law student at the University of Washington at the time of the trial.

. Tina stated that Loretta would use the speaker phone during most of her phone conversations. Specifically, she stated, "She (Loretta) did when I was there a lot. In the bedroom, she would move around a lot and, you know, balance checks and stuff. She sat at a desk and she would hit speaker phone.”