Judgment rendered April 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,550-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                   Appellee

versus

ARTHUR ANDERSON                                      Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 345,027

Honorable John D. Mosely, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas Lee Harville

ARTHUR ANDERSON                      Pro Se

JAMES E. STEWART, SR.                Counsel for Appellee
District Attorney

TOMMY JAN JOHNSON
KODIE K. SMITH
MEKISHA SMITH CREAL
Assistant District Attorneys

* * * * *

Before STONE, STEPHENS, and MARCOTTE, JJ.

**STEPHENS, J.**

This criminal appeal arises out of the First Judicial District Court, Parish of Caddo, State of Louisiana, the Honorable John Mosely, Jr., presiding. Defendant, Arthur Anderson, was convicted by a unanimous jury of the second degree murders of Ashley Williams and Huey Leonard. The trial judge sentenced Anderson to the mandatory term of life imprisonment without benefits on each conviction and ordered the sentences to be served consecutively. Appellate counsel has appealed the sentence as excessive, and Anderson has filed a *pro se* brief urging insufficiency of the evidence and error in the trial court's ruling on the admissibility of Ms. Williams' dying declarations identifying Anderson as the man who shot her and Leonard. For the reasons set forth below, we affirm Anderson's convictions and sentences.

## FACTS/PROCEDURAL HISTORY

Russell Nicholson and Erica Johnson heard multiple gunshots from inside their home on Crosby Street on the evening of November 19, 2016. After hearing an SUV speed off, Nicholson and Ms. Johnson walked outdoors to find a blue car wrecked in the ditch just outside of their home. Ashley Williams, whom Nicholson recognized, had managed to crawl out of the driver's side of the blue Nissan Versa and was lying in the ditch. At trial, Ms. Johnson testified that Ms. Williams repeated several times, "Arthur [Anderson] shot us." Ms. Williams' passenger, Huey Leonard, was unresponsive in the blue Versa.

Earlier that evening, Ms. Williams had seen her ex-boyfriend, defendant, Arthur Anderson, at a gas station in a tan SUV, and he had confronted her about being in a relationship with Leonard. Although

Anderson allegedly had a girlfriend living with him in his mother's home, he was still trying to control Ms. Williams, who had told several friends and family members about her fear of him.

Shreveport Police Department Sergeant Charles Rose responded to the 911 call and was able to speak with the victim Ashley Williams. Sgt. Rose's mobile vision system ("MVS") recorded Ms. Williams telling responding officers that Arthur Anderson shot her. Ms. Williams also reported that Anderson was driving a tan SUV. Ms. Williams' cell phone records showed that Anderson called her 36 times the day of the homicides.

Further investigation revealed body damage to Ms. Williams' blue Versa that matched up to contact with the tan SUV driven by Anderson that night.[1] The murder weapon that killed Ms. Williams and Leonard was a .45 caliber semi-automatic handgun—Anderson was known to use a .45. The shots killing Ms. Williams and Leonard were fired at close range, and shell casings, bullet casings, and a bullet were found in the tan SUV driven by Anderson. Phone records tracked both Anderson's and Ms. Williams' mobile phones' movements, which also linked Anderson to the murders. However, there were no fingerprints or DNA that linked Anderson to the homicides.

Anderson was arrested, and on February 16, 2017, a Caddo Parish grand jury indicted him with two counts of second degree murder, violations of La. R.S. 14:30.1, for the murders of Ashley Williams and Huey Leonard. On February 22, 2017, Anderson pled not guilty after being formally

---

[1] The tan SUV is registered to and owned by defendant's ex-girlfriend, Debra Hayes, who lived with Anderson and his mother. Ms. Hayes was involved in hiding the SUV after the murder and repeatedly lied to police during the investigation.

arraigned. Jury selection took place October 24 and 25, 2022. Trial was held October 26-28, 2022. On October 31, 2022, the jury returned unanimous verdicts of guilty on both counts.

A motion for new trial was filed on November 9, 2022. A hearing on the motion was held on November 30, 2022, following which the motion was denied. On that same date, the trial court sentenced Anderson to consecutive terms of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. An out-of-time motion for appeal was filed on February 7, 2023. Both appellate counsel and defendant have filed briefs.

## DISCUSSION

### *Sufficiency of the Evidence*

In his first assignment of error, Anderson urges that the evidence was insufficient to support his convictions for two counts of second degree murder. Anderson contends that several of the trial court's evidentiary rulings, including those allowing into evidence statements made by Ms. Williams as she was dying, and his and Ms. Williams' cell phone records, were erroneous, and that there was insufficient evidence to prove Anderson's identity as the person who shot Ms. Williams and Leonard.

He claims that Ashley Williams' inadmissible statements (to Ms. Johnson that Arthur Anderson "shot them," and to Sgt. Rose, in response to his question, "Who did this to her?", "Arthur Anderson") were not dying declarations but were instead inadmissible hearsay. Even so, contends Anderson, these statements were insufficient to prove his identity as the shooter. As to the cell phone records, Anderson urges that they do not show *who* was using the phone at the time in question, and likewise, was

3

insufficient to prove Anderson was the person who shot Ms. Williams and Leonard.

According to Anderson, there was no direct evidence that he was the person who shot Ms. Williams and Leonard. Because the State failed to negate any reasonable possibility of misidentification beyond a reasonable doubt, no reasonable juror could have believed the "conflicting testimony and conjecture" of the witnesses. Anderson urges that the identifications of him as the shooter related by Ms. Williams to Sgt. Rose, Sgt. Clinton Grigsby, Ofc. Jamie Bryant, Russell Nicholson, and Erica Johnson were all hearsay and were the only direct unbiased evidence used to convict him. This shows that the admission of this alleged "dying declaration" evidence was far from harmless, contends Anderson.

Defendant was convicted of two counts of second degree murder in the deaths of Ashley Williams and Huey Leonard. Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries. *State v. Gilbert*, 55,257 (La. App. 2 Cir. 9/27/23), 372 So. 3d 403; *State v. Bull*, 53,470 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1175, *writ denied*, 20-00797 (La. 12/22/20), 307 So. 3d 1040.

4

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

### *Testimony*

Russell Nicholson testified that on November 19, 2016, he was living on the 4000 block of Crosby Street in Shreveport, Louisiana. After hearing shots that evening, he called 9-1-1. He looked out, and there was a car in a ditch outside his neighbor's yard. When he went out to see if anyone was

5

hurt, he found two people had been shot. The car, which was a small blue one, had its lights on. Nicholson recognized the girl "right off" as Ashley Williams, whom he knew as "Poo." There was a male stretched back in the passenger's seat. Ms. Williams had let herself down into the ditch on the driver's side of the car.

Ms. Williams was hurt, but talking. When Nicholson called her name, she recognized who he was. Ms. Williams rolled over and kept saying, "please don't let [me] die," and she wanted him to call her family members and let them know who shot her. She told him, "call my mother and tell her Arthur shot us." Ms. Williams said this a couple of times, but Nicholson was on the phone with 9-1-1 and told her he couldn't call. Someone else walked up and heard her. Ms. Williams "gave the number out," and the guy called and told her family what she said.

The 9-1-1 recording was played for the jury. Nicholson identified himself as the male caller and the female voice in the background as that of Ms. Williams. She could be heard saying, "please don't let me die." The police pulled up and Nicholson told the officer that a male and female had been shot. The officer talked to Ms. Williams. He then came back to Nicholson and asked whether she had told him who the shooter was. Nicholson then related to the officer what Ms. Williams had said to him. He later went down to the police station and gave a statement.

Erica Johnson testified that she was living with Russell Nicholson on Crosby Street on November 19, 2016. As she was getting out of the bathtub that evening around 9:30–10:00 p.m., she heard a series of gunshots. When she did, she hit the floor. Ms. Johnson was walking into the living room, where Nicholson was, and he also got onto the floor. She heard a truck or

6

SUV, what sounded to her like its pipes and motor, going towards the light at the corner. After hearing the vehicle pull off, Ms. Johnson went to get dressed, and Nicholson went to look out the back door to see if everything was okay.

Nicholson saw the car in the ditch, and they went to check it out. Nicholson called 9-1-1. Ms. Johnson heard a female screaming, "don't let me die," and "Arthur shot us." Ms. Johnson related that Ms. Williams said "Arthur shot us," "repeatedly…[until] she got picked up and put in the ambulance." According to Ms. Johnson, the car was in the ditch in front of the house next to theirs. After walking back down to the scene of the crash, Nicholson told her that the female was someone they knew. Ms. Johnson heard the female victim praying, asking God to protect her kids. She kept repeating that Arthur shot them and telling her and Nicholson not to let her die. The female also asked Nicholson about her male passenger, whom they had not noticed at first. He was between the seats, with his head in the back seat.

When police arrived, Ms. Williams was very responsive, and she was saying the same things, "Arthur shot us," "please don't let me die," and "call my family." The victim was taken to the hospital, and Ms. Johnson gave her statement to police. On cross-exam, Ms. Johnson related that she knew the female victim, Ashley Williams, from seeing her in the neighborhood, and she knew the male victim, Huey Leonard, because he stayed on the next street.

Patrol Supervisor Charles Rose of the Shreveport Police Department ("SPD") responded to the scene at 4000 Crosby Street at 10:30 p.m. in response to a report of a shooting. His MVS, the video system that SPD

7

patrol cars are equipped with, was recording at the time. The video from that night was shown to the jury. Sgt. Rose narrated the video for the jury. There were a couple of people standing on the side of the scene, and a vehicle was in the ditch on the north side of the street. He spoke with the female, who was on the ground next to the driver's side of the vehicle. She said the name "Arthur Anderson." There was a male in the passenger seat with a gunshot wound to the head. Ms. Williams was transported to the hospital.

Patrol Sergeant Clinton Grigsby and Officer Rudy Lewis also responded to the shooting on Crosby Street. Sgt. Grigsby observed Sgt. Rose on the scene, as well as Russell Nicholson and Erica Johnson. Upon arrival, Sgt. Grigsby saw a female lying at the rear of the vehicle trying to get up. Sgt. Rose tried to calm her down and keep her in place until the fire department could arrive. Sgt. Grigsby described the female victim as in distress, but conscious and talking, and the male passenger was deceased. While the officers asked the female questions, she stated that Arthur Anderson was the person who shot her. She also described the vehicle he was driving as a khaki or tan-colored SUV.

When asked to describe Ms. Williams' appearance and demeanor that evening, Sgt. Grigsby stated she was in discomfort and kept moving around. After learning that their possible suspect was Arthur Anderson, he advised the other officers. Sgt. Grigsby also gave them the description of the vehicle given to him by Ms. Williams. He then spoke to Nicholson and Ms. Johnson on the scene and then transported them to the station for a formal interview.

Another responding officer was SPD Patrol Officer Jamie Bryant. Upon his arrival at the scene on the 4000 block of Crosby Street, he saw a vehicle parked on the side of the road with a deceased male inside and a female who appeared to be injured in the ditch, mumbling. The vehicle did not appear to have been parked intentionally, but was more like it was on the side of the ditch after having rolled until it stopped. He knew the female had been shot because she kept saying that she had. The victim was in distress and apparent pain, trying to talk. He and Cpl. Grigsby asked her who shot her, and she was able to say faintly, "Arthur Anderson."

Shreveport Fire Department firefighter and paramedic David Carpenter testified that he got to the scene at Crosby Street at 10:35 p.m. At the time that he and his partner made contact with Ashley Williams, she was unresponsive and unable to speak. They got two SPD officers to help them load her into the back of the medic unit. Carpenter and his partner started IVs on Ms. Williams and opened her airway. They then put on a bag-value mask ("BVM") to provide ventilation. They tried multiple times but were unable to get blood from a finger stick, which is indicative of severe blood loss. Ms. Williams had six entry wounds from gunshots. Doctors were unable to revive her at the hospital, despite using advanced lifesaving procedures.

Next to testify was Rickey Simmons, who related that he was in a relationship and lived with Shawntina Williams, Ashley Williams' mother. Ashley lived with them "for a while." Arthur Anderson was Ashley's friend; they dated "for a while." Additionally, Anderson lived with them on Herndon for a few months. Simmons knew Anderson to have a gun—a black .45. Simmons also knew Huey Leonard; they met the day Huey was

9

murdered. Ashley and Huey drove Simmons to work at the Pizza Hut on Bert Kouns on November 19, 2016. He couldn't say whether Ashley and Huey were dating because he did not know. Simmons needed a ride because the fuel pump in his own car was "out."

There was no body damage to Ashley's blue Nissan Versa when he got into the car to go to work. He had to be at work at 5:00 p.m. He rode in the back, behind Ashley, the driver. Shawntina was on the other side, behind Huey, who was in the passenger side up front. Later, around 9:50 p.m., Ashley and Huey picked him up from work. Simmons didn't see Ashley or Huey with any weapons. He didn't know her to own or carry a gun. She smoked a "little weed," but he did not know her to do other drugs or sell drugs. From time to time, she might have had a "little drink." Simmons did not see any drugs or drug paraphernalia in the car. However, he saw Huey drinking a beer that night.

Ashley told him she was going to stop at the Valero on Kings Highway, but she had just seen Arthur there. She had seen the Tahoe he was driving and kept on going through the Valero parking lot.[2] After Ashley picked Simmons up, somebody kept calling her phone, and she kept hanging up. Ashley told him it was Arthur. She did not want to talk to him because she had already told him it was over. Simmons stated that the phone rang "constantly, back to back." Ashley answered it once, but Arthur kept calling, and she kept on hanging up.

---

[2] Shalaydra Chatman testified that on the evening of November 19, 2016, she was working as a cashier at the Valero on Kings Highway. Anderson came into the store trying to buy cigarettes. She ID'ed him, but he didn't have an ID. This was close to her shift being over, and she thinks it was around 10:30 p.m.

Ashley stopped at the Circle K at the corner of Centenary and Olive, then they went to his house. Shawntina wanted to talk to Ashley, and her cell phone rang while she was in the house with her mother. Ashley told her mother it was Arthur calling, and she hung her phone up. She told Simmons to lock the door after her, she would be back after she took Huey, who lived in Mooretown, home. Ashley never made it back.

As Simmons was changing from his work clothes, Shawntina's phone rang. After she answered it, she took the phone, threw it across the room, and started screaming. He picked up the phone, and a man said, "Sir, I'm not playing games. Your daughter gave us her mother's number and told us to call [and tell] her mother that she just got shot, to meet her at the hospital." Because his car wasn't running, he called his nephew to pick them up and take them to the hospital. Upon arriving at the hospital, they were told to wait in the family room by a nurse. After being told there were ten doctors working on her, the doctor and the priest came out to tell them that Ashley was dead.

Sergeant Hannah Clark with the SPD testified that she worked in Crime Scene Investigations ("CSI") in November 2016, and was assigned to the shooting on November 19, 2016, on Crosby Street. She described the scene as she saw it on her initial walkthrough for the jury. There was a blue Nissan Versa in the ditch close to the middle of the 4000 block of Crosby Street. The car was still running and its headlights were on. The front end was tilted a bit because it was up against the culvert of a driveway. There was a yellow sheet inside the front compartment of the car. She was told it was laid over the male victim by fire department personnel, something usually done for privacy purposes.

11

Sgt. Clark then identified photographs she took of the scene for the jury, several of which showed damage to and paint transfer on the car's driver side. Photos also depicted the inside of the car, which contained the male victim, a flip phone on the passenger side floorboard, shell casings, and projectiles, as well as damage caused by the gunshots. A gold coin purse, keychain, cell phone, beer can, and hair tie were found outside of and behind the vehicle. She further explained that all items numbered at the scene were collected and preserved as evidence. According to Sgt. Clark, not everything they found at the scene, for example, the hair tie, is relevant or related to the investigation, but is collected if it is near the crime scene because it cannot be known at that time in the investigation whether something is or is not relevant or related.

The pink keychain found was not the keychain from the car's ignition. SPD has no information as to whether it belonged to either victim. Likewise, they had no information that the gold coin purse, which contained scales and narcotics, or the cell phone found on the ground, belonged to either victim.

The blue Nissan Versa, as well as the vehicle driven by defendant, Arthur Anderson, a tan GMC Yukon, were placed in secured bays to be examined. Sgt. Clark explained photos taken of the Versa, some with dowel rods placed to show the extent and height of damage to the vehicle. Photos of the tan Yukon showed damage to its front and rear passenger side door, as well as measurements of the height of the damage. One of the photos showed blue paint transfer on the Yukon's front passenger wheel well. Paint scrapings were also collected from both vehicles and sent to the crime lab for analysis.

12

On cross-examination, Sgt. Clark was asked about the drugs found in the coin purse, which was outside behind the Versa. In the gold coin purse were: a baggie of 6.27 grams of a white substance suspected to be crack cocaine; five blue baggies of a white substance suspected to be crack cocaine weighing 1.70 grams total; one baggie of 3.12 grams of a green leafy substance; and another baggie with .35 grams of the same green leafy substance. She noted that no pills were found at the scene, although an SPD officer found two pills wrapped in a five-dollar bill in Ms. Williams' jeans pocket at the hospital. CSI wasn't able to identify those pills, and to her knowledge, no testing was done on any of the drugs found. From her experience, the scale found outside the vehicle is the type used for the measuring of drugs.

Sgt. Clark found six shell casings from a .45 caliber handgun, five from inside the car and one on the roof. She noted that they don't test shell casings for fingerprints because when a gun is fired, the heat it puts off basically erases the moisture from the fingerprints, if any, that would have been on the shell casings. The casings are not tested for DNA either. She acknowledged that paint chips can't tell who the driver of the tan Yukon was that night. She also doesn't know whether Ashley Williams or Huey Leonard was drinking from the open can of Bud Light found outside of the car. There were no fingerprints taken from the Versa, nor was a gunshot residue test conducted on Anderson's hands. According to Sgt. Clark, the crime lab doesn't conduct these tests as they are unreliable and give a lot of false positives.

Two phones were recovered from the scene—the flip phone from the floorboard, and the phone from the ground outside the Versa. On redirect

13

examination, Sgt. Clark reiterated that she does not know to whom the coin purse, drugs, or anything else found outside of the Versa belonged, or how long the items had been outside, or even whether they were relevant to this case.

Lieutenant Michael Gray of the Caddo Parish Sheriff's Office qualified as an expert in accident and scene reconstruction. At the request of the State, he evaluated the interaction between the blue Nissan Versa and tan GMC Yukon, the vehicles involved in the homicides of November 19, 2016. The vehicles were in storage at the SPD's secure facility. Lt. Gray performed 3-D laser scans of both vehicles to create three-dimensional models with the scans and engineering software. He also used photographs taken by Sgt. Clark of the scene and scanned the crime scene itself. Lt. Gray testified that he was able to identify the points of contact between the two vehicles, which he explained to the jury, illustrated by a video introduced into evidence.

On cross-examination, Lt. Gray specified that the models of the vehicles are computer models that each involved 25 million measurements, and are to-scale models, but in the virtual world. What he did was put those models together to the point where the damage on the Nissan Versa meshed together with the damage on the GMC Yukon. On redirect, Lt. Gray stated that what he was asked to do was objectively look at how the two vehicles interacted the night of the homicides. It was his expert opinion that the two vehicles came in contact with each other a number of times.

SPD Sergeant Bryan Lauzon testified that in May 2015, he and Sgt. Brent Mason issued Anderson a traffic citation. At the time, Anderson was

14

driving a 2001 tan GMC Yukon. They ran the license plate and/or VIN and determined that it was not stolen.

Richard Beighley testified that he retired after 40 years from the North Louisiana Crime Lab in 2020. At that time, he was the firearms section supervisor. Beighley identified State's Exhibit 94 as a copy of two of his certified crime lab reports in this case, one from 11-18-17 and one dated 11-26-18. Beighley stated that he analyzed six cartridge casings, two bullet jacket fragments from decedent Leonard, one bullet from decedent Williams, one bullet from the crime scene, and one bullet jacket and one bullet core from the crime scene. His conclusion was that all bullets, bullet fragments, and bullet jackets were fired from one weapon, and that the weapon used was a semi-automatic .45 caliber pistol. Beighley confirmed the testimony of Sgt. Clark that the crime lab does not perform gunshot residue testing.

On cross-examination, Beighley informed the jury that while cost may be one reason the crime lab stopped performing gunshot residue testing, the other reason was the evidentiary value of a positive test. According to Beighley, a positive test could mean one of three things: a person had recently fired a gun; he had touched a gun that had recently been fired; or he had been in the vicinity of a gun that had recently been fired.

Sherita Holden testified that she was assigned to the Violent Crimes/Homicide Division of the SPD in November of 2016, and she assisted Detective Taywania Jackson in the investigation into the homicides that took place on Crosby Street on November 19, 2016. The investigation into the tan Yukon, the car involved in the homicides, began after Det. Jackson received a phone call providing her with the identity and location of a female who was allegedly the Yukon's owner. Ms. Holden and Det.

15

Jackson went to a residence on North Market Street and found Debra Hayes. Thereafter, Det. Jackson obtained information that the tan Yukon could be found at an apartment complex in the North Market area. Ms. Holden went to that complex and located the Yukon. Ms. Holden identified the tan Yukon in photographs shown to the jury. She testified that the vehicle's registered owner was Ms. Hayes.

Dr. Long Jin, a forensic pathologist at Ochsner LSU Health Science Center, testified that he performed the autopsies on Ashley Williams and Huey Leonard and prepared reports summarizing his findings.

Ms. Williams was shot four times, only one of which was fatal. Dr. Jin described the fatal shot as a downward shot to her upper back which entered and perforated her right lung, diaphragm, and stomach before stopping in her right pelvis. A toxicology report was positive for hydrocodone, hydromorphone, oxycodone, oxymorphone, and marijuana in the blood, albeit at "not very high" levels which, per Dr. Jin, would not have affected Ms. Williams around the time of her death.

Leonard was also shot several times. His cause of death was a gunshot that entered his left chest, then traveled through his left lung and heart before exiting through his right lower abdomen. A toxicology report for Leonard was positive for cocaine, alcohol, and cocaethylene, a metabolite produced when persons drink and use cocaine at the same time. Dr. Jin stated that the cause of both victims' deaths was homicide, and the drugs in their systems did not contribute in any manner to their deaths.

SPD Detective Taywania Jackson testified that she was an on-call investigator assigned to Violent Crimes on November 19, 2016, and responded to the scene of the homicides in the 4000 block of Crosby Street.

16

She observed the scene and obtained the names of the victims and witnesses. She then interviewed Russell Nicholson and Erica Johnson, the two witnesses, at the police station. They described hearing a number of gunshots in the area and seeing a vehicle in the ditch. When they went outside, Nicholson and Ms. Johnson heard a voice, so they went over to the car and saw that the female, Ashley Williams, had gotten outside of the vehicle. Ms. Williams told Nicholson and Ms. Johnson a number of times, please don't let her die, please help her, please call her family, please tell them Arthur Anderson shot her, and Anderson was in a tan Tahoe.

At that point, Det. Jackson did not know who Anderson was. Her investigation progressed. Another detective gave her a photo of him from Facebook, which she compared to some she found on Facebook and from a database available to SPD, which includes photos such as those on driver's licenses. An arrest warrant was issued, and Anderson was arrested and brought to the police station. She read him his *Miranda* rights and had him sign a waiver form. Anderson's interview, which was recorded, was played for the jury.

Anderson told Det. Jackson that Ashley Williams was his ex-girlfriend. They had been going together a year or two, but broke up that Friday (November 15, 2016). Anderson had Ashley's mother drop him off at his mother's house at 2735 MLK Drive around 4:00 a.m. Friday. According to Anderson, he was at his mother's house all weekend. He never left the house after that, just slept and hung around. His parents left Friday around 2:00 p.m. and came home Saturday evening. His 16-year-old brother was home with them, and his sister Jessica was there part of the weekend.

17

When asked about his mobile phone, Anderson stated that he didn't know where it was, and he couldn't recall the last time he used it to talk or text. Anderson denied communicating with Ms. Williams since walking out after their argument about her cheating that Friday morning. According to Anderson, what he was wearing at the time of the interview, a gray Henley looking shirt and jeans, was what he had been wearing on Friday. While he was upset about the breakup, Anderson said the two had broken up and gotten back together before.

Anderson next told Det. Jackson that Ashley was a drug dealer. He knows because he had been staying with her at her mom's house on Herndon. He had helped her, but stopped when he got robbed by a guy in a red Expedition in December. Ashley was in the car when he got robbed. According to Anderson, last week the same guy pulled up on him while the guy was driving a tan SUV. Anderson knows the guy. Anderson reported the robbery in December to police, but didn't call police when he saw the guy on Friday.

Det. Jackson told Anderson that Ashley identified him several times as her killer in her last words. He denied knowing about Ashley's death until early Monday morning. According to Anderson, neither he nor his mother had heard about Ashley's car being shot up until Monday, and he found out about it that morning (Monday) when his mother woke him up and told him.

Det. Jackson had her supervisor at the time, Sgt. Strickland, administer a "simulation" of a gunshot residue test as a tactic to get Anderson to give them more information. What it did, however, was cause him to invoke his *Miranda* rights, so the interview was terminated.

18

After the interview, Det. Jackson followed up on information Anderson had given them about prior damage to Ms. Williams' vehicle he had paid to have repaired. Sgt. Jackson went to Sabbath Collision and confirmed that after Anderson had the vehicle repaired, there was no longer any damage to the body of the blue Versa. Anderson paid in cash and the vehicle was brought in to the body shop on November 14, 2016, days prior to the murders. The invoice detailing payment and the repairs was introduced into evidence.

Det. Jackson also described going to Consumers' convenience store to see whether they had surveillance video from the intersection of Crosby and Broadway Streets from the night of the murders. Footage was available, and management of the store gave her a copy of the time frame of the shootings. That footage was played for the jury, and Det. Jackson pointed out to them that at 10:21:43, the front of a tan SUV which looked like the suspect SUV appears at the intersection before proceeding through the traffic light. The 9-1-1 call was at 10:25 p.m. and minutes after that, the footage shows police responding to the scene at 10:34:37.

Det. Jackson testified that she interviewed Rickey Simmons, Ashley Williams' stepfather. Simmons also related that Ashley and Huey picked him up from work that night just before the murders. Ashley was on the phone arguing with Anderson while Simmons and Huey were in the car. Simmons further related to her that Ashley and Huey had just seen Anderson at the Valero on Kings Highway before coming to pick him up from work. Anderson tried to wave Ashley down but she didn't stop. He then started calling her, and they argued over the phone. Anderson said that he was upset about Huey being in the car.

19

Det. Jackson then went to the Valero to speak to a clerk who had worked the night of November 19, 2016. Ms. Chatman recalled seeing Anderson at the Valero on the night of the murders. This conflicted with the information Anderson gave in his statement. Det. Jackson requested surveillance video. When she went back to get the footage, she spoke with Shante Hayes, who provided her surveillance video, which showed Anderson getting out of a tan Tahoe (Yukon) and going in and out of the Valero at 9:24 p.m. the night of November 19, 2016. Through her investigation, Det. Jackson learned that Anderson had a white girlfriend named Debra Hayes who owned a tan Tahoe (Yukon). She found that Anderson had gotten a citation in the Yukon for loud music and no driver's license.

Debra Hayes came into the police station for an interview. Currently the State has a material witness warrant out for her. During the interview, Ms. Hayes gave Det. Jackson consent to go through her phone. In a recorded call between Ms. Hayes and Anderson on November 19, 2016, at 10:24 p.m., Anderson told Ms. Hayes that he shot at Ms. Williams and Leonard. After concluding the interview with Ms. Hayes, Det. Jackson got a warrant to search the cell phone records of Anderson, Ms. Williams, and Ms. Hayes. She also recovered the tan Yukon from the Lakefront Apartments on North Market Street. The Yukon had visible damage to its body.

On cross-examination, Det. Jackson testified that Furlonzo Moore is the male that Anderson accused of robbing him. She followed up on what Anderson told her about Moore having a tan SUV, but she did not find a tan vehicle registered to Moore. She called Moore's mother and told her she needed to speak to Moore. The mother never got back to Det. Jackson.

20

Defense counsel pointed out that it was probably because Moore was in Angola serving a life sentence. Det. Jackson acknowledged that Moore was in the penitentiary, and she was the lead detective on his murder case. She also verified Anderson's claim about the incident in December, including that he had filed a police report.

On redirect examination, Det. Jackson informed that jury that Moore's murder conviction involved a separate set of circumstances and different people. Additionally, Moore and Anderson look nothing alike and would not be confused for each other.

Randall Gohn testified that he is the Supervisory Special Agent over the Cyber Crime Unit of the Louisiana Attorney General's Office in Baton Rouge. He is certified to testify in the area of forensic cell phone analysis and historical cellular data analysis. In this case, Gohn was provided with the cell phone records for Ashley Williams, Arthur Anderson, and Debra Hayes.

Gohn stated that he used Google Maps software to plot the longitude and latitude for each mobile phone to plot the locations of the handsets associated to each phone number, which he demonstrated for the jury. He noted the location of Anderson's phone around 9:20 p.m. was somewhere near the tower south of the Valero gas station on Kings Highway. At about 9:30 p.m., it appears that Anderson's phone was traveling just north of the Interstate/highway. From 10:00 p.m. to around 10:15 p.m. the handset was near the south tower just to the east of the homicides. At 10:20 p.m., the phone was near the south tower just north of the homicides, and at 10:25 p.m., it was pulling back up on the tower north of the Valero. At 10:30 p.m.,

21

the handset was northeast of the Valero, indicating that Anderson's phone was moving away from the homicide location toward the MLK area.

Regarding the number of times Anderson contacted or attempted to contact Ms. Williams on the date of the homicides, Gohn noted that on November 19, 2016, between 9:25 and 10:20 p.m., there were several dozen calls—33 of them rolling over to voice mail. The last call from Anderson's handset to Ms. Williams' phone was at 10:20 p.m. At 10:20:07, Anderson's handset was hitting off the same area as the victim's—this is at or around the same time as the homicides. Anderson's phone reactivated briefly at 10:24:32, then went offline again. Anderson's phone records show that the call his handset received at 10:24:32 was from Debra Hayes' phone number. Her phone records are corroborative of this, noted Gohn.

Gohn testified that it was his expert opinion that Anderson's phone was at or near the same location as the phone of Ashley Williams at the time of the homicides. Likewise, Anderson's phone was at or near the Valero gas station on Kings Highway at approximately 9:25 p.m.

On cross-examination, Gohn stated that his information does not reveal who was operating Anderson's phone, just the location of the phone. He cannot say where Anderson or Ms. Hayes was the night of the homicides. On redirect, Gohn testified that at 8:00 p.m. on November 19, 2016, Ms. Hayes' phone was at or near Anderson's house. It was still there at 10:30 p.m.

There is a plethora of evidence to support the jury's verdict in this case: Ms. Williams' own statements to Russell Nicholson, Erica Johnson, and several police officers identifying Anderson as the shooter; the phone records showing a barrage of calls from Anderson to Ms. Williams after he

22

saw her at the Valero gas station with Leonard not long before the shootings (which was corroborated by the victim's and Anderson's phone records, the testimony of Rickey Simmons, Ms. Williams' stepfather, and video footage and testimony placing Anderson at the Valero); Simmons' testimony that he knew Anderson to carry a black .45 pistol; testimony by Richard Beighley that all of the shell casings, bullet fragments, and bullets found at the scene and in the victims' bodies came from one weapon, a semi-automatic .45 pistol; testimony by the accident reconstruction expert, Lt. Michael Gray, matching up the body damage found on the blue Nissan Versa to that found on the tan Yukon; testimony connecting Anderson to the tan Yukon; testimony of Randall Gohn tracking Ms. Williams' and Anderson's phones around the time of the homicides, particularly his expert opinion that, at the time of the shootings, both handsets were at or near the same location; and Detective Taywania Jackson's explanation to the jury of video footage showing a tan Yukon at the intersection of Crosby and Broadway Streets approximately three minutes before the 9-1-1 call reporting the shootings was placed by Russell Simmons.

The above evidence, when viewed in the light most favorable to the prosecution, was sufficient for the jury to find Anderson guilty beyond a reasonable doubt of the second degree murders of Ashley Williams and Huey Leonard. There is no merit to this assignment of error.

### *Admissibility of Dying Declaration Evidence*

Anderson next assigns as error the trial court's denial of his motion to exclude the victim's identification of him as the shooter. According to Anderson, the identification did not qualify under the "dying declaration" exception to the hearsay rule as set forth in La. C.E. art. 804(B)(2), and this

erroneous ruling was not harmless beyond a reasonable doubt. Anderson cites a number of cases in support of this argument.

According to Anderson, the requirement for a statement to be a dying declaration is that it be made under a sense of impending death without any sense of recovery. He urges that in the instant case, at the time of Ms. Williams' statement, nothing supports the conclusion that "hope of living" had been lost.

Anderson urges that the identifications of him as the shooter related by Ms. Williams to Sgt. Rose, Cpl. Grigsby, Ofc. Bryant, Russell Nicholson, and Erica Johnson were all hearsay and were the only direct unbiased evidence used to convict him. This shows that the admission of this alleged "dying declaration" evidence was far from harmless, contends Anderson.

A hearsay statement is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C); *State v. Hearold*, 603 So. 2d 731, 737 (La. 1992). La. C.E. art. 804(B)(2) provides that a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death, is not excluded by the hearsay rule if the declarant is unavailable as a witness.

For a declarant's statement to be introduced into evidence under the "dying declaration" exception to the hearsay rule, the court must be satisfied that (1) the declarant believed his death was imminent/impending, and (2) the declarant's statement concerned the cause or circumstances of the impending death. *Garza v. Delta Tau Delta Fraternity National*, 05-1508 (La. 7/10/06), 948 So. 2d 84; *Welch v. Willis-Knighton Pierremont*, 45,554

24

(La. App. 2 Cir. 11/17/10), 56 So. 3d 242, *writs denied*, 11-0075, 11-0109 (La. 2/25/11), 58 So. 3d 457, 459. The victim does not have to express, in direct terms, his awareness of his condition. The necessary state of mind can be inferred from the facts and circumstances surrounding the declaration. *State v. Burns*, 32,904 (La. App. 2 Cir. 2/1/00), 750 So. 2d 505; *State v. Timon*, 28,747 (La. App. 2 Cir. 10/30/96), 683 So. 2d 315, *writ denied*, 96-2880 (La. 4/25/97), 692 So. 2d 1081.

In this case, the facts and circumstances clearly indicate Ms. Williams' awareness of the seriousness of her condition. After being run off the road, shot six times and left in a ditch, she managed to crawl out of her wrecked car and call for help. Her cries were heard by two neighbors, Russell Nicholson and Erica Johnson. Nicholson testified that he heard Ms. Williams say, "please don't let me die," "call my mother and tell her Arthur shot us," several times. Ms. Johnson also heard Ms. Williams say, "don't let me die," and "Arthur shot us," a number of times, and she heard the victim praying as well, asking God to protect her kids. Sgt. Rose tried to keep Ms. Williams calm through her distress and discomfort as they waited for paramedics to arrive. In response to questions asked by responding officers, Sgt. Grigsby and Ofc. Bryant, Ms. Williams related that Arthur Anderson was the shooter. She also described the vehicle he was driving as a khaki or tan-colored SUV.

Minutes later, by the time paramedics arrived, Ms. Williams' condition had deteriorated. She was unresponsive and unable to speak. Paramedics put a BVM on Ms. Williams to provide ventilation. They tried multiple times but were unable to get blood from a finger stick, which is indicative of severe blood loss. Ms. Williams had six entry wounds from

gunshots. Upon her arrival at the hospital, doctors were unable to revive her, despite using advanced lifesaving procedures.

While no absolute rule can be laid down by which to decide certainty whether the declarant, at the time of making her statement, really expected to die, yet when the wound is from its nature mortal, and when, as a matter of fact, the deceased shortly after making her statement died, the courts have uniformly held that the declarant really believed that death was impending, and the statement has been admitted as a dying declaration. *State v. Verrett*, 419 So. 2d 455, 456 (La. 1982), *citing State v. Augustus*, 129 La. 617, 56 La. 551 (1911). Given the severity of Ms. Williams' injuries, the circumstances surrounding her declarations, the substance and content of her declarations, and her subsequent death, we find that her declarations to Nicholson, Ms. Johnson, and the responding officers were dying declarations, and as such were properly admitted into evidence.

Anderson also assigned as error his appellate counsel's failure to "master the trial record, thoroughly research the law, and identify arguments that may be advanced on appeal, [such as those set forth in his *pro se* assignments of error Nos. 1 and 2,] and prepare and submit a brief on the merits and argue the appeal." This assignment of error, however, was not briefed, and, as such, will not be addressed. *See, State v. Wright*, 445 So. 2d 1198 (La. 1984); *State v. Dewey*, 408 So. 2d 1255 (La. 1982); *State v. Carlisle*, 315 So. 2d 675 (La. 1975); *State v. Green*, 38,335 (La. App. 2 Cir. 5/12/04), 873 So. 2d 889, *writ denied*, 04-1795 (La. 11/24/04), 888 So. 2d 227. Finally, Anderson asked this Court to perform an error patent review. We have reviewed the record for errors patent pursuant to La. C. Cr. P. art. 920 and have found none.

*Excessiveness of Sentence*

Anderson's appellate attorney urges that the trial court's imposition of consecutive life sentences, to be served without the possibility of probation, parole, or suspension of sentence, serve no justifiable or rehabilitative purpose and therefore are excessive, notwithstanding the seriousness of Anderson's crimes of conviction. Anderson, a 32-year-old, will be incarcerated for the rest of his life, followed by the a "second, theoretical life," which is an impossible sentence to serve. Thus, these consecutive life sentences serve no purpose.

The trial court did not give an adequate explanation for imposing this "impossible" sentence, urges appellate counsel, omitting any reference to Anderson's criminal, social, work, or personal history. Furthermore, the two murders arise from the same incident. Although the trial court has discretion to impose consecutive sentences, appellate counsel argues that in this case, it was an abuse of discretion because the imposition of two life sentences serves no purpose—there is no punishment Anderson can serve beyond his *one* natural life. Appellate counsel urges this Court to vacate the consecutive sentences and order that Anderson's sentences be served concurrently.

The State points out that, contrary to defense counsel's argument, the trial court *did* articulate adequate reasons for its imposition of consecutive sentences. Furthermore, the record supports consecutive sentences following testimony elicited at the sentencing hearing. Anderson did not make a statement at the hearing, and the trial judge commented that he showed no remorse. The trial court noted that Anderson destroyed the lives of not just the two victims, but also their children and parents. In recounting

27

the facts of the case, the judge stated that Anderson ran the victims off the road and gunned them down with no opportunity to defend themselves or escape death. The trial court further opined that Anderson was a danger to society, and a lesser sentence would take away from the seriousness of the offenses.

The State suggests that the trial court specifically imposed consecutive sentences to avoid the deprecation of the seriousness of the offenses. The trial court has the statutory authority to impose consecutive sentences, and the facts of this case support its determination to do so. What shocked society was the crimes committed by Anderson, not the consecutive life sentences. The State cites *State v. Jamison*, 55,361, pp. 13-14 (La. App. 2 Cir. 11/29/23), 375 So. 3d 619, 627, wherein this Court recognized that a defendant's severe disregard for the value of human life is sufficient to justify and support the imposition of consecutive sentences. The State compares the actions of Anderson in this case of chasing down his victims and violently executing them to those of the defendant in *State v. Jamison*, *supra* (in which the defendant showed a severe disregard for the value of human life when he shot three people, killing one and severely wounding the others, merely to demonstrate his intolerance for perceived disrespect).

No motion to reconsider sentence was made or filed in the instant case. When a defendant fails to timely file a motion to reconsider sentence under La. C. Cr. P. art. 881.1, the appellate court's review is limited to the bare claim of constitutional excessiveness. *State v. Mims*, 619 So. 2d 1059 (La. 1993); *State v. Passaniti*, 49,075 (La. App. 2 Cir. 6/27/14), 144 So. 3d 1220, *writ denied*, 14-1612 (La. 3/6/15), 161 So. 3d 14; *State v. Smith*, 46,343 (La. App. 2 Cir. 6/22/11), 71 So. 3d 485, *writ denied*, 11-1646 (La.

28

1/13/12), 77 So. 3d 950. Under constitutional review, a sentence can be excessive, even when it falls within statutory guidelines, if the punishment is so grossly disproportionate to the severity of the crime that it shocks the sense of justice and serves no purpose other than to inflict pain and suffering. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So. 2d 1; *State v. Passaniti*, *supra*; *State v. Fatheree*, 46,686 (La. App. 2 Cir. 11/02/11), 77 So. 3d 1047.

This Court reviews "consecutive vs. concurrent" sentencing arguments as part of a constitutional excessiveness review. *State v. Passaniti*, *supra*; *State v. Barnett*, 46,303 (La. App. 2 Cir. 5/18/11), 70 So. 3d 1, *writ denied*, 11-1612 (La. 4/13/12), 85 So. 3d 1239. When two or more convictions arise from the same act or transaction, or constitute part of a common scheme or plan, the terms of imprisonment shall be served concurrently, unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. Concurrent sentences are not mandatory; the trial court has the discretion to run the sentences consecutively. *Id.*; *State v. Minnieweather*, 52,124 (La. App. 2 Cir. 6/27/18), 251 So. 3d 583.

Since Anderson only contests the consecutive nature of his sentences,[3] and it was within the trial court's discretion to order the sentences to run consecutively rather than concurrently, the focus of the analysis is whether the trial court stated the factors considered and its reasons for the consecutive terms. La. C. Cr. P. art. 883; *State v. Smith*, *supra*; *State v. Passaniti*, *supra*.

---

[3] We note that a life sentence for second degree murder is mandatory. La. R.S. 14:30.1.

29

This assignment of error has no merit. As noted by the State, the trial court gave its reasons for the imposition of two consecutive life sentences. Among its considerations were statements by family members of the victims, Huey Leonard's father and Ashley Williams' children, describing the impact the loss of their loved ones has had on them; Anderson's lack of remorse; and the specific facts of the case. Additionally, the judge stated that a lesser sentence would be like Anderson getting "two for one."

If this is not a case for consecutive life sentences, this Court has a hard time picturing what one would look like. A spurned Romeo who chased down and at close range fired a number of shots, two of them fatal, at his former girlfriend and a male friend in such a cold-blooded manner, before leaving them in a ditch to die, is exactly what La. C. Cr. P. art. 883 contemplates. The consecutive life sentences imposed in this case are not excessive by constitutional standards.

## CONCLUSION

For the reasons set forth above, the convictions and sentences of defendant, Arthur Anderson, are affirmed.

**AFFIRMED.**